IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CAROL A. RICH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-09-89-M |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

Plaintiff, Ms. Carol A. Rich, seeks judicial review of a denial of disability insurance benefits (DIB) by the Social Security Administration. This matter has been referred for proposed findings and recommendations. *See* 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons set forth below it is recommended that the Commissioner's decision be reversed and remanded for further proceedings consistent with this Report and Recommendation.

**I.     Procedural Background**

Ms. Rich filed her application for DIB with a protective filing date alleging an inability to work beginning July 24, 2003. Her application was denied initially and on reconsideration. *See* Administrative Record [Doc. #11] (AR) at 64-65, 66-67. Following a hearing, an Administrative Law Judge (ALJ) issued an unfavorable decision. AR 19-26. The Appeals Council denied Ms. Rich's request for review. AR 1-4. This appeal followed.

## II. The ALJ's Decision

The ALJ determined that Ms. Rich last met the insured status requirements of the Social Security Act on June 30, 2004. AR 21. Therefore, the period under consideration is July 24, 2003, the alleged onset date of Ms. Rich's disability, through June 30, 2004, her date last insured. AR 21. The ALJ then followed the five-step sequential evaluation process required by agency regulations. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); 20 C.F.R. § 404.1520. At step one, he determined that Ms. Rich had not engaged in substantial gainful activity at any time relevant to the period under decision. AR 21. At step two, the ALJ determined that Ms. Rich had the following medically determinable impairments: migraines, seizures and depression. AR 21. However, the ALJ further determined at step two that Ms. Rich did not have a severe impairment or combination of impairments. The ALJ, therefore, denied disability benefits at step two. AR 21, 26.

## III. Standard of Review

Judicial review of the Commissioner's final decision is limited to determining whether the factual findings are supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Poppa v. Astrue*, 569 F.3d 1167, 1169 (10th Cir. 2009). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (quotation omitted). A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004). The court

"meticulously examine[s] the record as a whole, including anything that may undercut or detract from the [administrative law judge's] findings in order to determine if the substantiality test has been met." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (citations omitted). While the court considers whether the ALJ followed the applicable rules of law in weighing particular types of evidence in disability cases, the court does not reweigh the evidence or substitute its own judgment for that of the Commissioner. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quotations and citations omitted).

## IV. Issues Raised on Appeal

Ms. Rich asserts two propositions of error: (1) the ALJ failed to perform a proper evaluation at step two of the sequential evaluation process; and (2) the ALJ failed to perform a proper credibility determination.

## V. The Medical Record

The only medical evidence in the record prior to the onset date is unrelated to the impairments at issue and references treatment for acute pharyngitis in March 2003. AR 335-339. The medical evidence for the time period under review – July 24, 2003 through June 30, 2004 – is sparse. On the alleged onset date Plaintiff was admitted to the Tulsa Regional Medical Center with a chief complaint of syncopal activity. AR 187. Ms. Rich reported to the attending physician that she suffers from migraines but was not taking any prophylactic medication. AR 188. She stated that she goes to the emergency room and receives shots for her migraines. *Id.* The attending physician described Ms. Rich as "very anxious and easily

dissolves into tears, very dramatic." *Id*. Her listed medications included Paxil and Prozac. AR 187.

During her hospital stay, Dr. Gage provided a psychiatric consultation. AR 190-192. His assessment was major depressive disorder, recurrent, severe, without psychotic features, posttraumatic stress disorder, rule out alcohol abuse, rule out conversion disorder (pseudoseizures). AR 191-192. He assessed her current GAF at 40 and estimated her highest GAF in the last year to be 50.[1] *Id*. Dr. Gage also discussed the history of Ms. Rich's illness. He noted a number of "psychiatric issues, stressors, and symptoms" relating to traumatic incidents in her childhood. AR 190. In addition, in 1982, two of Ms. Rich's children were killed when a water heater blew up and engulfed her home in flames. *Id*. *See also* AR 54 (Ms. Rich's testimony concerning the death of her children). Referencing this incident, Dr. Gage specifically noted: "[t]his apparently happened on July 28, 1982, and I do not think it is a coincidence that her symptoms are quite a bit worse now." AR 190. Dr. Gage described her symptoms of depression as chronic and noted that Ms. Rich admits "to having nightmares, and sometimes vivid daydreams about traumatic incidents in her past." AR 191.

---

[1] A global assessment of functioning (GAF) score "is a subjective determination based on a scale of 1 to 100 of the clinician's judgment of the individual's overall level of functioning." *Salazar v. Barnhart*, 468 F.3d 615, 624 n. 4 (10th Cir.2006) (quotation omitted). A GAF of 31-40 is extremely low, and indicates "some impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) (4th ed. 2000) at 32. A GAF score of 41-50 indicates "serious symptoms" or "serious impairment in social, occupational, or school functioning" such as inability to keep a job. *Id*.; *see also Langley v. Barnhart*, 373 F.3d 1116, 1123 n. 3 (10th Cir.2004).

Ms. Rich was also examined by Dr. Harvey Drapkin. AR 193-195. His impression was multiple syncopal episodes, refractory migraine cephalgia and major depression. AR 194. On discharge, Ms. Rich was encouraged to seek outpatient psychiatric help. AR 186, 192.

The next medical treatment occurred almost ten months later in May 2004. Ms. Rich was taken to the OU Medical Center Emergency room after having a seizure while visiting a family member at the hospital. AR 215-218. The medical record states: "[n]o history of bipolar disease, schizophrenia or other psychiatric illness." AR 216. Ms. Rich's husband refused treatment for her and, against medical advice, Ms. Rich left the hospital. *See id*. ("[T]he husband is at the bedside and states he is refusing to have any [treatment] done for his wife, and that they would both like to leave and go home.").[2]

As discussed below, the record indicates that Ms. Rich's condition worsened after her five-year-old granddaughter died of cancer in June 2004, one month prior to the date last insured. *See, e.g.,* AR 321, *infra*.

In August 2004, just a month or so following the date last insured, Ms. Rich presented to the Medical Associates of Cushing for treatment of sinusitis. The record reports a "seizure-like episode" while at the office and Ms. Rich was transferred to the Cushing Regional Hospital. AR 318. She had no further seizure activity during the hospitalization.

---

[2]A later hospital record similarly evidences that Ms. Rich left prior to receiving full treatment and against medical advice. AR 285-286. The record indicates her husband was waiting to pick her up at the hospital. The record also notes a concern that Ms. Rich may have been subjected to physical abuse. *Id*.

5

The discharge diagnosis was sinusitis and seizure disorder. AR 318. During her hospitalization, Dr. Scott Turner examined Ms. Rich. AR 321-323. In the section of his report headed "History of Present Illness" he states the following:

> [T]he patient reports recently diagnosed seizure disorder that consists of 'grand mal seizures' that began occurring after the death of her granddaughter in June. These usually lasts [sic] 30 seconds to a minute. She has one to two a week. She was evaluated at the University of Oklahoma in Oklahoma City and she reports having EEG which was negative and started on Phenobarbital with a once a day test dose and was told to follow up care with her primary care physician in her area. We have no records of recent evaluation but she does report the medicine has no effect on her seizure like episodes. . . . .

AR 321.

In October 2004, Ms. Rich presented to the Cushing Regional Hospital to seek treatment for a cut to her left index finger. No other medical conditions were addressed at this time. AR 309-315. The records do reference, however, that "while ambulating" to the emergency room, she "started seizing" and was eased to the ground by a nurse. The seizure was reported to have lasted 45 seconds. AR 309. The records also reflect that she had started a new, unknown seizure medication nine days prior to the hospital visit. AR 309.

Ms. Rich's next hospitalization related to the impairments at issue occurred nearly one year later in June 2005. She presented to the emergency room at the Stillwater Medical Center complaining of "multiple seizure-like episodes." She was examined by Joel Ormsby, a certified physician assistant, who made the following statement concerning Ms. Rich and her medical treatment:

6

> This patient has a history in 2001 of not being truthful with physicians, namely Kent Smalley, M.D. at that time. There are records available to which I have referred today to review. She has a history, according to the patient, that she might be bipolar. Kent Smalley, M.D., saw this patient for suspected stroke in 2001. She was also seen by Dr. Hagan. The patient, at that time, had professed to three myocardial infarctions at age 21, to which Dr. Hagan through his echocardiogram found no evidence and also had a completely normal EKG. The patient at that time gave several different physicians all different stories regarding her medical history. She was diagnosed at that time with a personality disorder not otherwise specified, severe depression, chest pain resolved, and a stroke workup, which was negative.

AR 220.³ His diagnosis was possible seizure activity, depression, personality disorder and methamphetamine use by urinalysis. *Id*. He referred Ms. Rich to Dr. Rathbun for follow-up treatment but the record contains no evidence that Ms. Rich ever went to see Dr. Rathbun.

Ms. Rich received significant emergency room treatment for the remainder of 2005 for seizures. *See* AR 230-242 (Drumright Regional Hospital, August 9, 2005); AR 243-279 (Hillcrest Hospital, November 14, 2005); AR 280-293 (Tulsa Regional Medical Center, November 29, 2005); AR 294-306 (Cushing Regional Hospital, December 8, 2005). While at the Cushing Regional Hospital in December 2005, Ms. Rich was seen by a social worker, Jeff Sinderson. His notes reference that the examining physician, Dr. Dotson, had made arrangements for Ms. Rich to be transferred to Hillcrest Medical Center for further neurological evaluation. AR 306. The notes state: "There is some concern that her seizures are not genuine and that Carol should be evaluated psychiatrically." *Id*.

---

³The underlying medical records containing the 2001 diagnosis of a personality disorder and severe depression are not included in the record before the Court. The ALJ made no reference to this diagnosis in his analysis of the medical evidence.

Ms. Rich was admitted to Hillcrest on December 8, 2005. AR 344-346. The diagnostic impression of the attending physician included seizure disorder, bipolar, major depression and suicidal ideation. AR 346.

Apart from her many emergency room treatments, the only evidence of regular treatment received by Ms. Rich is from the Mary Mahoney Memorial Health Center and occurred after her date last insured. The treatment records from Mary Mahoney span the time period from June 2005 through December 2005, AR 367-375, and from May 2006 through August 2007, AR 427-445. Consistent with the other medical evidence of record, the treatment records reflect the severity of Ms. Rich's impairments increased after the death of her granddaughter in June 2004. For example, in May 2006, the records state:

> This patient presents with a migraine. She also complains of depression. She was doing well for a while there but she has sunk into a very severe depression. This was around the time where she had a granddaughter that passed . . . .

AR 445.

On March 2, 2006, Burnard Pearce, a non-examining consultative physician, completed a Psychiatric Review Technique (PRT) form for the time period July 24, 2003 through the date of his review. AR 376-389. He noted that Ms. Rich alleged disability based on bipolar disorder and seizures and then summarized her medical records from July 2003, and May, August and November 2004. He concluded "[t]here is insufficient medical evidence to document a disability on or before the Date Last Insured, 06/30/2004 and

8

continuing to the present." AR 388. He did not, therefore, make any findings regarding any functional limitations related to Ms. Rich's impairments. AR 386.

## VI. Analysis

Ms. Rich contends the ALJ did not make a proper step two determination. Specifically, Ms. Rich claims the ALJ failed to properly develop the record, failed to properly consider the opinion of a treating physician, and "would have failed at steps 3, 4 and 5 of the sequential evaluation process had he extended his evaluation that far." Ms. Rich also claims that the ALJ failed to perform a proper credibility analysis. Plaintiff's Opening Brief at 2.

### A. The ALJ's Step Two Determination

The ALJ first found that through the date last insured, Ms. Rich had three medically determinable impairments: migraines, seizures and depression. AR 21. The ALJ summarized Ms. Rich's testimony about the limiting effects of her impairments but found her testimony not entirely credible.[4] The ALJ then discussed the medical evidence of record from the alleged onset date in July 2003 through August 2004.[5]

The ALJ first addressed Ms. Rich's seizure disorder. He treated the seizure disorder as a physical impairment and relied on SSR 87-6 in determining Ms. Rich's seizure disorder

---

[4]Ms. Rich's husband also appeared at the hearing and testified as to the effects of Ms. Rich's seizures (AR 56-58), but the ALJ does not mention that testimony.

[5]Following August 2004, the next medical record relating to the impairments at issue is for emergency room treatment Ms. Rich received in June 2005. As discussed, the record includes evidence of treatment through 2006. However, the ALJ did not discuss any medical evidence after August 2004.

9

was not severe. AR 24.[6] He also cited the assessment of the state agency medical consultant as support for determining the seizure disorder was not severe. AR 25. That consultant assessed the medical records and found "insufficient evidence" to document any impairment prior to the date last insured. AR 390.

Next the ALJ addressed Ms. Rich's migraines. He rejected her testimony regarding her difficulty with migraines as not corroborated by the medical evidence of record. The ALJ noted a single headache complaint in the medical record in August 2004 which a CT revealed to be caused by sinusitis. AR 25 *citing* Exhibit 7F, AR 318-319.

Finally, the ALJ found Ms. Rich's depressive disorder to be non-severe. AR 25. He relied on the fact that Ms. Rich "did not seek treatment for any psychological complaints after her hospitalization in June 2003 through her date last insured in June 2004." AR 25. He further noted that "[d]uring two examinations, after her [date last insured] expired, in August 2004 and October 2004, the claimant presented with no psychological complaints" and "even denied depression during the examinations." AR 25 *citing* Exhibit 7F, AR 294-341.[7] He relied further on the PRT form completed by the agency physician whose medical

---

[6]The medical records indicate the seizures may have been attributed to conversion disorder, a mental impairment. *See, e.g.,* AR 184 (diagnosis of rule out conversion disorder); AR 239 (observing Ms. Rich to have suffered both seizures and pseudo-seizures); AR 285 (discharge diagnosis of pseudoseizure); AR 306 ("There is some concern that her seizures are not genuine and that Carol should be evaluated psychiatrically."); AR 353 (diagnostic impression of both seizure and pseudoseizures); AR 392 (discharge diagnosis of pseudoseizure); AR 403 (diagnosis, Axis I – probable conversion disorder; Axis III – probable pseudoseizures).

[7]The August 2004 record shows that Ms. Rich denied depression but did report increased anxiety. AR 322. The ALJ did not address this aspect of the record.

10

disposition of the case was "insufficient evidence." AR 25, *citing* Exhibit 10F, AR 376-389. The ALJ stated: "A finding the claimant suffers from no severe psychological impairment is consistent with the DDS physician's psychiatric review technique form (Exhibit 10F) and the undersigned granted the doctors' [sic] opinion significant probative weight." AR 25.

The ALJ concluded "the medical evidence of record does not support more than minimal limitations in [Ms. Rich's] ability to perform basic work activities due to any medically determinable impairment." AR 25. The ALJ based this conclusion on the fact that Ms. Rich had access to medical care but chose not to seek such care. He opined that such lack of treatment "supports a finding that the claimant's psychological symptoms are not significant." AR 25.

Step two requires the claimant to demonstrate that she has a medically severe impairment or combination of impairments. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, *i.e.*, do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basis work activities." Soc. Sec. Rul. 85-28, 1985 WL 56856 at *3. "If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process." *Id*.

The showing a claimant must make at step two is *de minimis.* Step two is designed "to weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability." *Bowen v. Yuckert*, 482 U.S. 137, 156

11

(1987) (O'Conner, J., concurring). *See also Langley*, 373 F.3d at 1123. Nevertheless, "while the showing a claimant must make at step two is *de minimis*, a showing of the mere presence of a condition is not sufficient." *Cowan v. Astrue*, 552 F.3d 1182, 1186 (10th Cir.2008) (*citing Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir.2003)).

The ALJ's determination that Ms. Rich did not satisfy the *de minimis* showing of a severe impairment required at step two is not supported by substantial evidence. First, as Ms. Rich claims, the ALJ did not discuss all of the medical evidence of record. Significantly, the ALJ did not address the GAF score of 40 given by Dr. Gage in July 2003. AR 192.[8] That GAF score included a "highest" score estimate of 50 for the previous year, indicating that Ms. Rich's mental impairments may have been sufficiently severe for purposes of the *de minimis* showing required at step two.[9] Because Ms. Rich's GAF scores reflecting serious impairments are uncontroverted, the ALJ's error in this regard is significant.[10]

---

[8] Ms. Rich also claims error on the basis that the ALJ did not properly weigh the GAF score as the opinion of a treating physician. Typically, a treating physician is one "'who [has] treated a patient over a period of time or who [is] consulted for purposes of treatment." *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987) (citation omitted). As set forth herein, a remand is required because it was erroneous for the ALJ not to address the GAF score in his opinion. For this reason, the Court need not decide whether Dr. Gage would qualify as a treating physician or whether the ALJ further erred by not giving specific weight to the GAF score. On remand, however, the ALJ is reminded that greater weight is given to the opinions of treating physicians than "reports of physicians employed and paid by the government for the purpose of defending against a disability claim." *Frey*, 816 F.2d at 513 (citation omitted).

[9] The Vocational Expert who testified at the hearing said that a person assessed with a GAF score between 40 and 50 "would have serious difficulty in maintaining and sustaining work-like procedures and keeping a job." AR 62.

[10] This GAF score is consistent with other, similar GAF scores after Ms. Rich's date last insured. *See* AR 247 (November 2005 GAF 50/65); AR 342 (December 2005 GAF 50/50); AR 348 (December 2005 GAF 40/50); AR 403 (March 2006 GAF 30/50).

Second, the ALJ analyzed Ms. Rich's seizures solely as a physical impairment, utilizing Soc. Sec. Rul 87-6 governing the evaluation of epilepsy. AR 24-25.[11] However, the record includes many references indicating that Ms. Rich's seizures may be attributed to conversion disorder, a mental impairment.[12] The ALJ's failure to address the evidence of conversion disorder constitutes error.

In addition, the ALJ did not discuss any medical evidence after August 2004, wholly ignoring the significant treatment Ms. Rich received during the year 2005 and after. This evidence, though falling outside the date last insured, is relevant to demonstrating the long history of her impairments. *See, e.g., Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009) (evidence after the date last insured "can be used in helping to elucidate a medical condition during the time for which benefits might be awarded) (citation omitted).[13]

---

[11]"Social Security Ruling 87-6 applies when an individual claims to meet the epilepsy listing from the Listing of Impairments." *Vaughn v. Shalala*, No. 93-7045, 1994 WL 32748 at *4, n. 3 (10th Cir. Feb. 3, 1994) (unpublished op.). Because medical advances have made most epilepsy adequately controlled through appropriate medical treatment, a claimant alleging disability due to epilepsy must do more than show that she suffers from a seizure disorder. Instead, a claimant must show that the seizures are either so poorly controlled (despite compliance with a prescribed treatment regimen) or are of such frequency and/or severity, that they preclude her from engaging in any substantial gainful work. Soc. Sec. Rul. 87-6, 1987 WL 109184 at *1.

[12]"Conversion disorder is a psychiatric condition in which emotional distress or unconscious conflict are expressed through physical symptoms." *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 535 n. 2 (6th Cir. 2007). *See also* Stedman's Medical Dictionary 526 (27th ed.2000) (defining conversion disorder as "a mental [disorder] in which an unconscious emotional conflict is expressed as an alteration or loss of physical functioning, usually controlled by the voluntary nervous system"). It is a type of somatoform disorder. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, (DSM-IV) (4th ed. 2000) at 452.

[13]Although, as noted above, the evidence suggests Ms. Rich's condition may have worsened after the death of her grandchild in June 2004, the ALJ made no such finding and this Court is
(continued...)

In addition to these errors, the ALJ made Psychiatric Review Technique findings regarding the severity of Plaintiff's mental impairments which do not appear to have support in the record and which do not appear to be informed by any opinions rendered by a physician. *See Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994) ("There must be competent evidence in the record to support the conclusions recorded on the [Psychiatric Review Technique] form and the [administrative law judge] must discuss in his opinion the evidence he considered in reaching the conclusions expressed on the form." (quotation omitted)). While the ALJ relied on the Psychiatric Review Technique findings as support for his conclusion that Ms. Rich's mental impairments were not severe, a careful review of the PRT completed by Dr. Pearce, shows the "medical disposition" to be a finding that there was insufficient evidence, not a finding that the impairment was not severe. AR 376.

In addition to these errors, the ALJ, without citation to any evidence of record, opined that Ms. Rich had access to medical care but chose not to seek treatment and relied on her lack of treatment as a further basis for his step two determination. He reached this conclusion without considering the reasons, if any, Ms. Rich did not seek treatment including whether Ms. Rich could afford treatment.[14]

---

[13](...continued)
prohibited from providing post hoc justifications for the ALJ's decision. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (the decision of the ALJ is "evaluated based solely on the reasons stated in the decision," without engaging in a "post hoc effort to salvage" it).

[14]There are references in the record to Ms. Rich's difficulty with obtaining medical care. *See, e.g.,* AR 192 (July 24, 2003; Axis IV – "problems with access to health care"); AR 375 ("The patient reports she was diagnosed with bipolar disorder in 1995 although she has not had any routine
(continued...)

In sum, in making the step two determination, the ALJ impermissibly cited favorable evidence while ignoring the unfavorable evidence. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."); *Hamlin v. Barnhart*, 365 F.3d 1208, 1215, 1219 (10th Cir. 2004) ("An ALJ must evaluate every medical opinion in the record," and an "ALJ may not pick and choose which aspects of an uncontradicted medical opinion to believe, relying on only those parts favorable to a finding of nondisability"); *see also Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001) ("[W]hen . . . an ALJ does not provide any explanation for rejecting medical evidence, we cannot meaningfully review the ALJ's determination."). Under these circumstances, the ALJ's step two determination is not supported by substantial evidence and a remand is required.

Ms. Rich also claims the ALJ erred in his duty to develop the record. She claims the ALJ should have obtained treatment notes from Dr. Vaydia, a doctor in Stillwater, Oklahoma, whom Ms. Rich purportedly saw on an outpatient basis for her bipolar disorder some time prior to December 2005. *See* AR 350. Ms. Rich further claims the ALJ should have obtained records of her hospitalization in Stillwater "secondary to trying to hurt

---

[14](...continued)
management as far as this disorder, as a result of finances."). In addition, Ms. Rich testified that she could not obtain treatment records from one hospital because the hospital was no longer in existence. AR 36. The record does not disclose the precise time period during which Ms. Rich obtained treatment from this hospital.

15

herself." *See* AR 350. And, Ms. Rich faults the ALJ for not mentioning a notation in the record that she "received counseling by a psychiatrist named Sharon in June 2004." *See* Plaintiff's Opening Brief at 5 *citing* AR 219, 350.

A claimant bears the burden of proving disability prior to the expiration of her insured status. *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir.1997). Nonetheless, because a social security disability hearing is a nonadversarial proceeding, the ALJ bears responsibility for ensuring that "an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. United States Dept. of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir.1993); 20 C.F.R. §§ 404.1512(a)-(c), 404.1513. This duty includes the requirement that the ALJ develop a complete medical record by obtaining medical evidence from the twelve months prior to the date of plaintiff's application for benefits. 20 C.F.R. § 404.1512(d). The regulations also require the ALJ to develop Plaintiff's complete medical history for the twelve-month period prior to the month Plaintiff was last insured for disability insurance benefits. 20 C.F.R. § 404.1512(d)(2).

Ms. Rich was represented by counsel at the hearing before the ALJ, and counsel submitted to the ALJ numerous medical records for consideration. These records pertained to the twelve-month period under review. The ALJ had no further duty to comb these medical records for possible leads to additional medical evidence not otherwise provided to the ALJ.

However, the ALJ should consider, on remand, whether it would be beneficial to order a consultative examination with respect to evidence in the record regarding Ms. Rich's

conversion disorder. Such a consultative examination may be instructive as to the interaction, if any, of the conversion disorder with Ms. Rich's other mental impairments. Whether to require such a consultative examination is a determination left to the discretion of the ALJ on remand.

As part of her first claim of error, Ms Rich also appears to challenge errors the ALJ would have made at steps three, four and five of the sequential evaluation process had the ALJ proceeded that far. *See* Plaintiff's Opening Brief at 2, 8. Because the ALJ made a determination of disability at step two of the sequential evaluation process, his analysis ended there. *See Lax*, 489 F.3d at 1084 ("If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary.") (emphasis added). Therefore, these claims of error are not reviewed as any alleged error at steps three, four and five would be hypothetical and speculative only.

### B. The ALJ's Credibility Determination in Relation to Step Two

As her second claim of error, Ms. Rich also challenges the ALJ's credibility determination. As set forth above, however, the ALJ erred in his evaluation of the medical evidence at step two and a remand is required. The issue of credibility at step two will necessarily be affected by the ALJ's analysis of medical evidence on remand. Therefore, this issue need not be addressed at this time.

However, the Court notes that the ALJ's reasons for discounting Ms. Rich's testimony appear not to be supported by substantial evidence. For example and as set forth above, the ALJ relied on her lack of treatment and noncompliance with seizure medication,

17

but did not discuss reasons for her lack of treatment or purported noncompliance such as ability to afford treatment.[15] In addition, in making his credibility finding the ALJ focused exclusively on exertional factors as reflected in her daily activities without addressing limiting effects resulting from seizures or her other mental impairments. *See* AR 25-26 ("By her own testimony, [Ms. Rich] stated that in a typical day she took care of her puppies, performed housework, watched television, listen to the radio do laundry, and help with yard work . . . [and] was able to lift about 25 pounds and sit up to 4 hours and walk about 3 hours of an eight hour day."). Finally, in making his credibility determination, the ALJ did not reference the testimony of Ms. Rich's husband regarding her seizures, *see* AR 56-58, when such evidence is appropriately considered. *See* Soc. Sec. Rul. 96-7p, 1996 WL 374186 at *8 (addressing other sources of information). On remand, the ALJ is reminded that he must closely and affirmatively link his credibility determination to substantial evidence as required by *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) and provide specific reasons for the determination in accordance with *Hardman v. Barnhart*, 362 F.3d 676, 678 (10th Cir. 2004).

---

[15]If, as the record suggests, Ms. Rich suffers from conversion disorder, this may explain the lack of effectiveness of the prescribed seizure medication and provided an explanation for Ms. Rich's purported noncompliance.

## RECOMMENDATION

It is recommended that the Commissioner's decision be reversed and remanded for further consideration consistent with this Report and Recommendation.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to object to this Report and Recommendation. *See* 28 U.S.C. § 636. Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections, and a party may respond to another party's objections within 14 days after being served with a copy of the objections. Fed. R. Civ. P. 72(b)(2). Any objections and responses must be filed with the Clerk of the District Court. Failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

## STATUS OF REFERRAL

This Report and Recommendation terminates the referral by the District Judge in this matter.

ENTERED this __19th__ day of February, 2010.

_____
VALERIE K. COUCH
UNITED STATES MAGISTRATE JUDGE